## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § | |
| Plaintiff, | § § | |
| | § | |
| vs. | § § | CIVIL ACTION H-08-2429 |
| | § | |
| O'REILLY AUTOMOTIVE INC., D/B/A O'REILLY AUTO PARTS, AND OZARK AUTOMOTIVE DISTRIBUTORS, INC. | § § § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

This Title VII case is before the court on multiple motions for summary judgment.[1]

### Background

Ozark Automotive Distributors, Inc. is a wholly-owned subsidiary of O'Reilly Automotive Inc. d/b/a O'Reilly Auto Parts (collectively O'Reilly). O'Reilly operates a distribution center and warehouse in Houston called the Houston DC. This lawsuit involves alleged discrimination against hourly-paid African-American employees at that facility. Three such employees filed charges of discrimination in July 2006.

Dorothy Horton, an African-American materials handler, charged a hostile work environment based on racial epithets beginning on May 14, 2005.[2] Cynthia Hill, an African-American former materials handler, charged she was the subject of a retaliatory discharge

---

[1] The district court has referred this case to this Magistrate Judge for pretrial management (Dkt. 5).

[2] Dkt. 28, ex. A.

on May 22, 2006.[3] And Albert Richard, an African-American materials handler and forklift operator, charged wage discrimination based on his loss of a pay premium when he was moved from night shift to day shift.[4]

The three charges were assigned to different EEOC investigators. O'Reilly submitted initial position statements on each charge on September 28, 2006. The Richard investigator sought supplemental information regarding the shift move, including whether specific Hispanic employees were moved, the rate of pay of the Hispanic employees, and information about operator license revocations. O'Reilly provided supplemental information on May 23, 2007 and again on August 16, 2007.

On August 27, 2007, the Horton investigator sent a notification to O'Reilly regarding all three charges stating:

> The investigation of the referenced charges has revealed a matter which is so like or related to the allegations of the charge it is appropriate to expand the investigation to class [sic] as it relates to Black employees being passed over for promotional opportunities.

> Since this issue did not appear in the original charges, the purpose of this letter is to formally notify [O'Reilly] that the issues are being included in our investigation of the above referenced charges.[5]

The letter requested a general position statement, as well as specific information regarding the STEP program. STEP is a management skills class that O'Reilly offers to team members

---

[3]   Dkt. 28, ex. B.

[4]   Dkt. 28, ex. C.

[5]   Dkt. 28, ex. G.

interested in learning more about what is required of a supervisor. The EEOC characterizes this as a prerequisite to promotion; O'Reilly says it is not. O'Reilly provided the specific information requested, but declined to submit a position statement "regarding the improperly asserted and vaguely defined promotion claim."[6] The EEOC made no more requests for information.

On January 31, 2008, the EEOC issued three separate Letters of Determination with respect to the charges of Horton, Hill, and Richard. As to the Horton charge, the EEOC concluded that she and other unnamed African-Americans at the DC "were subjected to an unlawful hostile environment and different terms and conditions of employment."[7]

As to Hill, the EEOC found no reasonable cause for the retaliation charge, but also concluded:

> Hill and other African-American employees at [the DC], where [Hill] began working in the 1990s, were subjected to racially hostile comments, and that management failed to address complaints from African-American employees about the alleged hostile environment. Witness testimony also indicates that African-Americans were . . . required to work alone on job tasks which non-African-Americans were permitted to work with assistance from co-workers.[8]

As to Richard, the EEOC concluded that he "was given a lower wage based on his race/national origin." The EEOC again repeated its conclusion that African-Americans at

---

[6]     Dkt. 28, at 8 and ex. D, ¶ 8.

[7]     Dkt. 28, ex. H.

[8]     Dkt. 28, ex. I.

the Houston DC were subjected to an unlawful hostile work environment.[9]

Finally, in all three Letters of Determination the EEOC stated:

> The Commission's investigation also revealed sufficient evidence to establish that Respondent has a history of failing to promote black employees at its [Houston DC]. Respondent has a "STEPs program," and entry into the program is putatively a prerequisite for receiving a promotion. The evidence establishes that from June 2004 through September 2007, no African-American at Respondent's [Houston DC] received a promotion to "Supervisor in Training," although several were in the STEPs program during that period. Approximately seven (7) Hispanics in the STEPs program, and at least one white non-Hispanic, did receive promotions to Supervisor in Training during that period. Further, some evidence suggests that non-blacks were promoted without having to participate in the STEPs program.

The EEOC's determination did not identify the African-American employees denied promotion, or any specific supervisory position it alleges should have been filled with an African-American employee.

The EEOC sent a conciliation demand on March 13, 2008 seeking payments to Horton, Hill, and Richard and payments in unstated amounts to unidentified individuals denied promotions.[10] O'Reilly rejected the EEOC's conciliation terms.[11] The EEOC notified O'Reilly in May that conciliation efforts were unsuccessful[12] and filed this lawsuit on August 7, 2008.

---

[9]     Dkt. 28, ex. J.

[10]    Dkt. 41 (under seal).

[11]    Dkt. 28, ex. D; Dkt. 27, ex. 14.

[12]    Dkt. 28, ex. K.

In an amended complaint filed September 11, 2008, the EEOC seeks relief under Title VII on behalf of Dorothy Horton, Albert Richard, "and other African-American employees and former employees" for (1) unlawful hostile work environment; (2) wage discrimination; (3) discriminatory differences in terms and conditions of employment; and (4) discriminatory denial of promotions. Although the complaint identifies only Horton, Richard, and Hill by name, in discovery the EEOC apparently identified 17 additional allegedly aggrieved persons.[13]

## Motions for Summary Judgment

There are currently 4 separate motions for summary judgment before the court: (1) O'Reilly's first motion for summary judgment on its affirmative defenses (Dkt. 28); (2) O'Reilly's second motion for summary judgment on the merits (Dkt. 30); (3) O'Reilly's partial motion on Horton's damages claim (Dkt. 25); and (4) the EEOC's partial motion for summary judgment on attorneys' fees (Dkt. 27).

O'Reilly's first motion seeks dismissal of the EEOC's claims based on its affirmative defenses, specifically: (1) the EEOC's failure to promote claim is not supported by a proper charge; (2) the other claims in the lawsuit exceed the scope of the initial 3 charges by Horton, Hill, and Richard; (3) the EEOC failed to adequately investigate or conciliate all the claims; (4) claims that arose more than 300 days before the filing of the initial 3 charges are time-barred; and (5) failure to promote claims based on promotion decisions before October 31,

---

[13]     Dkt. 28, at 8-10; Dkt. 31, exs. B, C.

2006 are time-barred.

O'Reilly's second motion seeks dismissal of the EEOC's claims (except Horton's hostile work environment claim) on the merits on the grounds that the EEOC cannot make a prima facie case of discrimination as to each aggrieved party, or alternatively, cannot show that defendants' legitimate explanation for its acts as to each aggrieved party is pretext for discrimination.

O'Reilly's motion for partial summary judgment seeks dismissal of Horton's claim for damages for physical injury. Finally, the EEOC's motion does not seek summary judgment in its favor on the merits, but seeks dismissal of O'Reilly's claim for attorneys' fees.

## A.    Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).

The standard for granting summary judgment in Title VII cases is by now too familiar to warrant extended recitation. *Reeves v. Sanderson Plumbing Prods., Inc.*, succinctly

6

summarizes the appropriate inquiry:

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

530 U.S. 133, 148-49 (2000). The court must draw all reasonable inferences in favor of the non-movant, and disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 150-51. Trial courts should not treat discrimination differently than other ultimate questions of fact for purposes of Rule 50 or 56. *Id.* at 148.

## B.    Section 707 v. Section 706

Before analyzing these motions, it is necessary to understand the statutory framework underlying the EEOC's claims. Section 706(f) authorizes the EEOC to bring suit against a private employer on behalf of a person or persons aggrieved by the employer's unlawful employment practices. In contrast, § 707 permits the EEOC to bring suit against employers it has reason to believe are engaged in "a pattern or practice" of unlawful employment discrimination. A pattern and practice case focuses on an "objectively verifiable policy or practice of discrimination" by an employer. *Inter'l Brotherhood of Teamsters v. United States.* 431 U.S. 324 (1977); *see EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 929-30 (N.D. Iowa 2009) (explaining distinctions between 706 and 707). The distinction is important. When bringing a § 706 case, "it is axiomatic that the EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all of the elements of their sexual

7

harassment claims to obtain individual relief for them." *CRST*, 611 F. Supp. 2d at 929.

O'Reilly contends that the EEOC has not pleaded or presented a Section 707 "pattern and practice" case. The amended complaint asserts that it is "authorized and instituted pursuant to Sections 706(f)(1) and (3) and 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f)(1) and (3) and 2000e-6 ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a."[14]

The EEOC's response to O'Reilly's motion for summary judgment does little to clarify the statutory basis for its claims. The EEOC states "when EEOC files an enforcement suit, it acts on behalf of the public interest, not as counsel for aggrieved individuals" and "there is nothing improper about the EEOC alleging both § 706 and § 707 claims in a Complaint."[15] Of course, the EEOC's general statements do not answer the question whether the EEOC properly has asserted *in this case* a pattern and practice of discrimination based on an objectively verifiable policy or practice by O'Reilly.

While pleading rules do not require recitation of magic words, it is telling that neither the amended complaint nor the EEOC's summary judgment briefing use the phrase "pattern and practice" of discrimination. The EEOC has not asked for a bifurcated trial.[16] And the

---

[14]   Dkt. 6.

[15]   Dkt. 42, at 18.

[16]   Generally, a 707 case is bifurcated into liability and individualized relief phases. *See CRST*, 611 F. Supp. 2d at 932; *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 179 (3d Cir. 2009).

EEOC has not designated a statistical expert, even though such evidence "is usually an important component of proof in a pattern and practice case." *See CRST*, 611 F. Supp. 2d at 953.

The EEOC does not allege, nor is there any evidence, that "racial discrimination ws the company's standard operating procedure – the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336. The allegations are that in certain instances O'Reilly has intentionally discriminated against African-Americans in paying wages and granting promotions. The EEOC has identified only a handful (7) of potential claimants allegedly denied promotion due to race, and none of these filed charges of their own. The EEOC does not allege that O'Reilly has a pattern and practice of denying promotions based on race, and indeed the numbers of African-Americans in supervisory positions would belie such a claim.[17]

Similarly, the EEOC asserts that a "class" of black employees has been subjected to a hostile work environment consisting of racist remarks over a span of several years.[18] But this class consists of six employees who allegedly heard racial epithets used by five supervisors (as well as some co-workers) in the warehouse during that time. O'Reilly has conceded that a jury issue has been presented on one claimant's hostile work environment claim. However, the allegations of the other five claimants hardly rise to the level of a

---

[17]    Dkt. 31, exs. A-4, A-5.

[18]    The EEOC relies on comments as far back as 2000. *See, e.g.*, Dkt. 42, ¶ 9.

pattern or practice of a racially hostile working environment over almost a decade in a warehouse with hundreds of employees. Even assuming § 707 to be an appropriate vehicle for such a claim,[19] the summary judgment record does not support it.

The court concludes that the EEOC has presented no facts or legal authority to justify proceeding as a § 707 pattern and practice case against O'Reilly. The court will analyze the EEOC's claims in the context of § 706, which requires individualized proof of every element of each claim. In particular, the hostile work environment claims will not be considered in the aggregate. Each claimant will be required to satisfy each element of the claim, including severity or pervasiveness, based on their individual experience.

## C.   O'Reilly's Affirmative Defenses

### 1.   Do the EEOC's claims impermissibly exceed the scope of the charges?

The EEOC asserts hostile work environment, wage discrimination, and failure to promote claims on behalf of Horton, Richard, and "other African-American employees." O'Reilly argues that the jurisdictional prerequisite of an EEOC charge is not met as to any claims other than those expressly raised in Horton's and Richard's EEOC charges.[20]

"The filing of a charge of discrimination with the EEOC is a condition precedent to the bringing of a civil action under Title VII." *Sanchez v. Standard Brands, Inc.*, 563 F.2d

---

[19]   *See E.E.O.C. v. Dial Corp.*, 156 F. Supp. 2d 926, 945-47 (N.D. Ill. 2001).

[20]   While the amended complaint mentions Hill as a person aggrieved by the hostile work environment, it does not assert a claim based on Hill's EEOC charge of retaliation.

439, 460 (5th Cir. 1970).  A charge may be filed by or on behalf of an aggrieved person, or by a member of the Commission.  42 U.S.C. § 2000e-5(b).  The scope of a Title VII complaint is limited to the allegations contained in the EEOC charge and those that "can reasonably be expected to grow out of the charge of discrimination."  *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008).

The filing of a charge is the first step in pinpointing and correcting employment discrimination.  If upon investigating a particular charge the EEOC discovers other discriminatory practices, the EEOC is not prevented from taking action on those practices. *E.E.O.C. v. Huttig Sash & Door Co.*, 511 F.2d 453, 455 (5th Cir. 1975) (allowing EEOC case to proceed on behalf of class even where charging party settled with the defendant); *E.E.O.C. v. Brookhaven Bank & Trust Co.*, 614 F.2d 1022, 1024-25 (5th Cir. 1980) (EEOC could bring suit predicated on, but not limited to, charge by private party, even where there was no reasonable cause to believe that individual's charge was true).  "[T]he civil action is much more intimately related to the EEOC *investigation* than to the words of the charge which originally triggered the investigation."  *Brookhaven*, 614 F.2d at 1024 (quoting *Sanchez*, 431 F.2d at 466).

> In determining whether the EEOC has properly added new charges in the complaint filed with the court, two countervailing policies must be considered. The first is the policy to expedite the judicial process.  To limit the EEOC to the precise charge filed would serve no purpose except to add greater delay and expense to the enforcement proceedings.  The second is the policy that employers should have the opportunity to settle with the EEOC and all aggrieved parties before court action is initiated.  If the employer has notice of the charge and has been offered an opportunity to remedy the problem without

11

litigation, it should not be allowed to avoid enforcement of the law because the original charge filed with the EEOC [by] the aggrieved party is slightly different form the complaint filed in court by the EEOC.

*Id.* at 1025.

The EEOC gave express notice that it was expanding its investigation to include "black employees being passed over for promotional opportunities." In its letters of determination, the EEOC informed O'Reilly that its investigation "revealed sufficient evidence to establish that [O'Reilly] has a history of failing to promote black employees at [the Houston DC]."[21]

Although, the EEOC did not inform O'Reilly that it intended to expand its investigation to include hostile work environment claims on behalf of a class of black employees, its letters of determination informed O'Reilly that its "investigation revealed sufficient evidence to establish that Charging Party and other black employees were subjected to a racially hostile work environment."[22]   And as to wage discrimination, Richard's charge included the assertion that "black employees" have suffered wage discrimination at O'Reilly.[23]

---

[21]     Dkt. 28, exs. G-J

[22]     Dkt. 28, exs. H-J.

[23]     Dkt. 28, ex. C.  Moreover, the letter of determination on Richard's charge gave some notice to O'Reilly that the EEOC had investigated wage discrimination on a class-wide basis. *See* Dkt. 28, ex. J ("Although Charging Party *[and apparently the other black forklift operators]* lost $.50/hour as a result of the shift change, the sole non-African-American did not have his hourly wage reduced, according to business records produced by Respondent."(emphasis added)).

The court concludes that allowing the EEOC to proceed on its claims promotes the policies identified in *Brookhaven*. The claims are similar enough to those in the charge that they could reasonably be expected to grow out of the investigation. O'Reilly's motion to dismiss based on its affirmative defense regarding the scope of the charges filed is denied.

## 2. Was there adequate investigation and conciliation?

After completing its investigation and before filing suit, the EEOC is obligated to "endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b); *E.E.O.C. v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir. 1981). Conciliation is the preferred means of achieving the objectives of Title VII. *E.E.O.C. v. Agro Distr., LLC*, 555 F.3d 462, 468 (5th Cir. 2009). The EEOC fulfills its conciliation obligation when it "outlines to the employer the reasonable cause for its belief that Title VII has been violated, offers an opportunity for voluntary compliance, and responds in a reasonable and flexible manner to the reasonable attitudes of the employer. *Klingler*, 636 F.2d at 1025; *Agro*, 555 F.3d at 468. Conciliation is a precondition to suit, but it is not jurisdictional. *Agro*, 555 F.3d at 469. "The Court's role in reviewing efforts to conciliate, while not inert, is modest; the EEOC, as the enforcement agency, has discretion to formulate conciliation efforts in each situation, but it must do so in good faith." *E.E.O.C. v. Bloomberg*, No. 07 Civ. 8383 (LAP), 2010 WL 4237077 *7 (S.D.N.Y. Oct. 25, 2010). "Where the EEOC fails to act in good faith, dismissal remains an appropriate sanction." *Agro*, 555 F.3d at 469.

13

O'Reilly argues that the EEOC did not comply with the investigation and conciliation prerequisites to suit because it failed to name the aggrieved "other African-American" employees in its letters of determination or conciliation offer.   O'Reilly relies on an unpublished district court decision from the Northen District of Iowa, *EEOC v. CRST Van Expedited, Inc.*, 2009 U.S. Dist. LEXIS 71396 (N.D. Iowa Aug. 13, 2009).   In *CRST*, the district court dismissed the EEOC's claims on behalf of 67 previously unnamed employees. *CRST* is "one of those exceptionally rare § 706 cases in which the record shows that the EEOC did not conduct *any* investigation of the specific allegations of the allegedly aggrieved persons for whom it seeks relief at trial before filing the Complaint – let alone issue a reasonable cause determination as to those allegations or conciliate them." *Id.* at *51 (emphasis in original).

The Fifth Circuit has approved dismissal where the EEOC does not attempt conciliation in good faith. In *Agro*, the EEOC repeatedly failed to communicate with Agro, failed to respond in a reasonable and flexible manner to Agro, and "abandoned its role as a neutral investigator and compounded its arbitrary assessment that Agro violated the ADA with an insupportable demand for compensatory damages as a weapon to force settlement." 555 F.3d at 468.

In this case, the EEOC's March 13, 2008 attempt at conciliation was cursory and did not provide much in the way of detail.   However, the identity of African-American employees at the Houston DC who had not been promoted was not a complete mystery to

14

O'Reilly. The potential number of aggrieved persons was not nearly as large as in *CRST*, nor were the EEOC's actions here nearly as contumacious as in *Agro*. Moreover, the EEOC apparently stood willing to respond to any reasonable inquiries or requests for information from O'Reilly, but O'Reilly chose not to engage in conciliation at all.[24] The court does not endorse the EEOC's conciliation efforts but cannot say that the EEOC failed to act in good faith.

O'Reilly's motion for summary judgment on the affirmative defense of failure to investigate and conciliate is denied.

### 3.    Are the EEOC's claims impermissibly based on time-barred acts?

Horton's charge, filed in July 2006, alleged a hostile work environment beginning in May 2005. O'Reilly argues that many of the examples of alleged harassment the EEOC relies upon took place years earlier and are time-barred. O'Reilly also contends that many of the events on which the EEOC relies in its promotion claim are time-barred. The court will examine the timeliness of each aggrieved person's claim as necessary in its analysis of the merits.

### D.    Hostile Work Environment

The elements of racially hostile work environment claim are: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected

---

[24]    *See* Dkt. 35, ex. 4; Dkt. 27-14.

a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001). The harassment must be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Watts v. Kroger Co.*, 170 F.3d 505, 509-10 (5th Cir. 1999). The plaintiff must subjectively perceive the harassment as severe or pervasive and this subjective perception must be objectively reasonable. *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).

Because the EEOC's amended complaint does not specify the aggrieved individuals (other than Horton) on whose behalf it is pursuing this claim, O'Reilly's motion focuses on the 5 employees other than Horton that the EEOC identified in discovery:[25] Linda Carter, Linda Guillory, Henry Allen, Roquelia Nash, and Sharon Rasmus.[26]

*Linda Carter*: Carter, a current O'Reilly employee, complains that Hispanic co-workers spoke Spanish in her presence, making her feel left out. The EEOC also cites her deposition testimony that a co-worker made "little comments" like "blacks eat chicken." Carter also testified that "it wasn't all the time . . . it wasn't like every other day." Carter mentioned that she once overheard a co-worker make a comment to another that "you work in the field" and she found that a "little offensive." She also said that her supervisor, Rachel

---

[25]   O'Reilly did not move for summary judgment on the merits of Horton's claim.

[26]   The EEOC in response has not named additional aggrieved individuals or otherwise disputed O'Reilly's identification of individuals on whose behalf the EEOC pursues this claim.

Ochoa, showed favoritism toward Hispanics by not evenly distributing work.[27] This is the extent of the evidence that Linda Carter was subjected to a hostile work environment.

The evidence presented by the EEOC is insufficient to create a fact issue as to whether Carter was subjected to severe and pervasive racial harassment that affected the terms and conditions of her employment.

*Linda Guillory*. Guillory, a current O'Reilly employee, complains that in 2000 a co-worker called her a monkey; in 2004 her supervisor, Terry Johnston, muttered "nigger" under his breath; in 2007 Johnston said "slave boy" but she does not know what he was talking about or to whom he was talking; at an unspecified time Johnston said that black employees were lazy; in 2008 a co-worker called her a "mayate," a derogatory Spanish slang term for a black person.[28]

Given the long period of time over which these few events occurred, they do not meet the standard of severe and pervasive harassment.

*Henry Allen.* Allen is a former O'Reilly employee discharged in 2008 for absenteeism. Allen testified that in 2002 he overheard a Hispanic female co-worker tell an African-American male co-worker that his girlfriend was not "a real Mexican lady" because a real Mexican lady would never date someone outside her race. Allen alleges that in 2006

---

[27]     Dkt. 42-9.

[28]     Dkt. 42-18. Because each claim fails even if the court considers incidents that occurred outside the 300-day limitations period, the court does not determine whether any particular claim is time-barred, or whether the continuing violation doctrine is applicable here.

a co-worker named Francisco called him mayate, and that in 2007 he heard a Hispanic co-worker call an African-American co-worker a "black ass" or "black motherfucker" during an argument.

The EEOC further points to Allen's testimony that the "n-word" was "pretty commonplace"; that Francisco continued to use racial slurs outside of work; and that a supervisor asked a Hispanic co-worker "what are you doing with this nigger?" referencing Allen, in the driveway of someone's house in 2008.[29]

Again, this evidence does not create a fact issue as to severe and pervasive harassment under Fifth Circuit standards.

**Roquelia Nash.**  Nash is a former O'Reilly employee.  She alleges that in December 2005 or January 2006, two co-workers and her supervisor, Todaro, sang songs that included the words mayate and negra.  Nash did not find them offensive at the time because she did not understand them.  Upon finding out in February or March 2006, she complained to an African-American supervisor.  The name-calling stopped for a about a week, but when she asked the co-worker and Todaro for help they called her mayate, and she also heard them say it another time.  It did not happen after April 2006.  Nash also testified that she was once told by a Hispanic co-worker that she needed a muzzle, which she thought had connotations of slavery, although she did not know if the remark could be considered racial.[30]

---

[29]     Dkt. 42-1.

[30]     Dkt. 42-12.

Nash's testimony reveals a few incidents of name-calling over a two-month period in 2006. This evidence does not create a fact issue as to severe and pervasive harassment.

**_Sharon Rasmus._** Rasmus worked for O'Reilly from 1997-2006. In 2003 or 2004 a co-worked called her a "nigger." Their supervisor separated them and they did not have any further problems.[31] This one-time event certainly would not support a hostile work environment claim by Rasmus.

The EEOC also relies on evidence that Damon Countee was called a "damn mayate" once by his supervisor; that a co-worker "would always call [Crystal Price] a nigger;" and that Stephanie Turner was told "numerous times" by a co-worker to "shut you black ass up." In addition, the EEOC cites testimony in which different employees stated that supervisors used the terms mayate, nigger, but without reference to a specific incident or employee.[32] But none of this evidence is tied to the claim of an identified aggrieved person. The EEOC tries to save its hostile work environment claims based on the aggregation of disparate incidents that happened to numerous people over a long period of time. However, as the court has repeatedly noted, the EEOC must show that each individual on whose behalf it is pursuing § 706 claims has an actionable claim. It has not done so. O'Reilly is entitled to summary judgment on the EEOC's hostile work environment claim as to all allegedly aggrieved persons other than Horton.

---

[31]    Dkt. 42-17.

[32]    Response, Dkt. 42, at 7-8.

### E.    Wage Discrimination

The EEOC alleges that Richard and other African-American team members lost $.50 per hour as a result of a shift change, while non-African-Americans on the team at the time of the shift change did not lose any pay.  During discovery, the EEOC identified Rigoberto Covarrubias as the non-African-American team member who did not lose pay, and in fact got a raise.  O'Reilly argues that a reasonable jury could not find that its legitimate reason for the pay disparity cited by the EEOC is merely a pretext for discrimination.

O'Reilly has presented the affidavit of Elizabeth Mendez, the DC Human Resources Supervisor, explaining the situation with Covarrubias.[33]  According to this uncontroverted affidavit, Covarrubias was a relatively new employee at the time of the shift change and his 84-day evaluation was approaching.  Mendez prepared an evaluation form and status change form for Covarrubias and circulated them to his supervisors for approval.  After everyone had signed off on the forms, Mendez processed the standard 84-day raise of $0.25 per hour, raising Covarrubias's pay from $8.50 to $8.75 per hour effective July 2, 2006.  While the 84-day evaluation and status change forms were being approved, and unbeknownst to Mendez, supervisor Zermena completed status change forms for the employees switching from night shift to day shift, including Covarrubias.  As a result of that status change, all employees, including Covarrubias, received a reduction of $0.50 per hour effective July 2, 2006.  The corporate office contacted Mendez because they were confused about why Covarrubias had

---

[33]    Dkt. 31-1, ex. A.

two status change forms both effective July 2, 2006.  Mendez reviewed the forms, and mistakenly told corporate to change Covarrubias's pay to $8.50 per hour, instead of $8.25 per hour. It was simply an error on her part.[34] The EEOC does not present any evidence to show that instead of a simple error, the pay differential was intentional discrimination against Richard or other African-Americans.

In further support of its wage discrimination claim, the EEOC alleges that "numerous" African-Americans have provided evidence of not receiving premium pay for operating forklifts, citing the depositions of Derek Houston, Linda Guillory, and Shannon Dotson.[35] Not only are these allegations unpled,[36] but the EEOC has presented no evidence that a non-African-American received the pay premium under the same circumstances.  In sum, the EEOC has not presented sufficient evidence of wage discrimination to survive summary judgment.

### F.    Terms and Conditions of Employment

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such

---

[34]    The EEOC's motion to strike Mendez's affidavit is denied.  Mendez's deposition (Dkt. 42-8) and the affidavit (Dkt. 31-1), are not inconsistent.  The latter merely further explains the documentary evidence that Mendez did not recall when shown the document at her deposition.

[35]    Dkt. 42, at 16.

[36]    In addition, the EEOC apparently never identified Guillory or Houston as aggrieved persons for purposes of its wage discrimination claim.  *See* Dkt. 30, at 9.

individual's race . . . ."  The EEOC argues, without citation, that "the plain text of the statute has not been supplanted by the judicially created 'ultimate employment decision' doctrine."[37] Nonetheless, the EEOC characterizes its disparate terms and conditions allegations[38] not as free-standing claims for relief, but as evidence of the hostile work environment that existed at O'Reilly's Houston DC.[39]

The EEOC's disparate terms and conditions allegations again are an attempt to prove its case through generalized allegations of misconduct, without reference to the claim of a particular aggrieved person.  Of the individuals identified in the EEOC's briefing as having suffered disparate terms and conditions of employment, only Nash has been identified by the EEOC as an aggrieved person for purposes of its hostile work environment claim.  The added allegations regarding Nash are not sufficient to save the EEOC's claim on her behalf.

### G.    Failure to Promote

---

[37]    Dkt. 42, at 18.

[38]    The EEOC's response refers generally to discriminatory treatment of African-Americans by supervisors Josie Hernandez, Gloria Rodriguez, Rachel Ochoa, Ray Salazar, and Rachel Todaro.  The alleged disparate terms and conditions faced by African-American employees are:  (1) Herandez would not send Torrey Jones help when he needed it; (2) Rodriguez once did not let an unnamed black worker into the warehouse without an employee badge; (3) Roquelia Nash was required to provide doctor's excuses for absences and Hispanics were not; (4) Todaro took away Crystal Price's training badge and gave it Laura Ramirez, and also took away Dwayne Jones's badge.

[39]    Dkt. 42, at 18 ("Whether or not 'terms and conditions" of employment establishes a distinct cause of action, the evidence of African-Americans at the warehouse being given more burdensome workloads, disfavored vacation scheduling, etc. is relevant to the hostile environment claims discussed above.").  Counsel reiterated this position on the record at the November 10, 2010 hearing.

22

The EEOC alleges that from June 2004 through January 2008 (when it issued its letters of determination), no African-American hourly employee was promoted to supervisor-in-training, while during the same period 8 non-Blacks (all but one of whom is Hispanic) were promoted to supervisor-in-training. O'Reilly denies that its promotion decisions were discriminatory, and argues that many of the asserted claims are time-barred. The limitations defense will be considered first.

### 1.    Statute of Limitations

The EEOC contends that the usual Title VII 300-day limitation period is not applicable to its claims. The court disagrees. The EEOC's brief relies on case law holding the limitation period inapplicable in § 707 pattern and practice cases. *See, e.g., E.E.O.C. v. Dial Corp.*, 156 F. Supp. 2d 926, 949 (N.D. Ill. 2001). This is not a pattern and practice case. The EEOC also argues that the 300-day limitation period does not apply to continuing violations. But the continuing violation doctrine does not apply to discrete acts of discrimination such as a failure to promote. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002); *Celestine v. Petroleos De Venezuela SA*, 108 Fed. Appx. 180, 182 n.3 (5th Cir. 2004) ("This Court did not and still does not apply the continuing violation doctrine to discrete incidents such as training, hiring or promotion."). Finally, the EEOC relies on one district court case, *E.E.O.C. v. Sterling Jewelers, Inc.*, No. 08-CV-706, 2010 WL 86376 *4-5 (W.D.N.Y. Jan. 6, 2010), holding that because the EEOC is not limited to the claims contained in an administrative charge, the EEOC's complaint need not be limited in scope

to violations occurring within the 300-day period.   Apparently no circuit court has yet

weighed in on this issue, but many district courts have come to the opposite conclusion from

*Sterling Jewelers. See, e.g., E.E.O.C. v. Freeman*, No. RWT- 09cv2573, 2010 WL 1728847

*2-3 (D. Md. Apr. 27, 2010) (listing cases); *E.E.O.C. v. Bloomberg*, No. 07 Civ. 8383 (LAP),

2010 WL 4237077 * 15 (S.D.N.Y. Oct. 25, 2010) (EEOC may not seek relief for individuals

for discrete unlawful acts outside the 300 days preceding the filing of the triggering charge.)

The EEOC must satisfy the elements of an actionable claim for each aggrieved person

in this § 706 case.  The promotions claim grew out of the Richard charge filed on July 25,

2006.  Thus, the EEOC can pursue failure to promote claims based on promotion decisions

made no earlier than 300 days prior to this charge, or September 28, 2005.

## 2.    The STEP Program and Individual Promotion Claims

An employee in a failure to promote case must establish: (1) he is a member of a

protected class; (2) he sought and was qualified for a promotion; (3) he was rejected for the

position; and (4) the employer continued to seek applicants or promoted applicants with the

employee's qualifications." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir.

2004); *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 354-55 (5th Cir. 2001);

*Haynes v. Pennzoil Co.,* 207 F.3d 296, 300 (5th Cir. 2000).

According to the EEOC, "the 'inexorable zero' of black selectees for promotion at the

very least raises an inference of pretext sufficient to preclude summary judgment."[40]  The

---

[40]    *See Teamsters*, 431 U.S. at 342 n.23 (the company's inability to rebut the inference of
discrimination came not from misuse of statistics but from the "inexorable zero.")

EEOC argues that Erika Crayton, Dwayne Jones, Doug Lott, Christian Anowey, Torey Haywood, Chris Smith, and Crystal Price are qualified black employees who sought promotions and were rejected, and the positions were filled by non-blacks.[41]

The EEOC concedes that the aggrieved persons did not apply for a specific promotion. However, according to the EEOC, they were not admitted to O'Reilly's STEP program, which would have qualified them for promotion. STEP stands for "Selecting, Testing, and Evaluating Potential." It is a management skills class that O'Reilly offers to team members interested in learning supervisory skills. Selection for STEP classes requires completion of a survey and employment for at least 90 days, no corrective actions in the prior 6 months, and at least a score of "meets expectations" on recent performance evaluations. The DC general manager, HR supervisor, and operations managers decide by consensus who should be admitted to the STEP program each year. STEP participants retain their existing position and pay. O'Reilly states that the STEP program is not a prerequisite to promotion, but merely a training opportunity, and that both African-American and other employees have been promoted without it.[42] The EEOC says that even if STEP is not a formal prerequisite for promotion to supervisor-in-training, there is no other mechanism for hourly employees in the

---

[41]   Dkt. 42, at 14.  The EEOC's response also mentions that Damon Countee tried repeatedly from 2003 until 2005 to be considered for promotion.  *Id.* at 11.  But the EEOC did not previously identify Countee as an aggrieved person for purposes of its failure to promote claim.  *See* Dkt. 30, at 10.  In any event, Countee's claim is time-barred because there is no evidence that he sought promotion after September 28, 2005, within 300 days of the EEOC charge asserting this claim.

[42]   Dkt. 31, ex. A, Mendez. aff. ¶¶ 12-22.

DC to be considered for promotion. The EEOC further says that none of the African-American employees identified by O'Reilly as holding supervisor positions were promoted from the ranks of Houston DC hourly workers.[43]

A refusal to train is not an adverse employment action under Title VII unless it affects employment status, benefits or responsibilities. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 406-07 (5th Cir. 1999). It appears to the court that the EEOC has at least raised a fact issue as to whether participation in STEP classes is sufficiently tied to promotions to meet the *Shackelford* test. However, deficiencies remain in the EEOC's proof. The EEOC does not address each individual's qualifications for STEP training or any available promotion, as compared to the qualifications of any individual actually selected.[44]

In addition, the EEOC has not offered evidence that any of O'Reilly's legitimate explanations for its actions are pretexts for discrimination. There were only twelve promotions available during the relevant time period. Any inference of discriminatory intent from such a small sample would be dubious at best. "If the plaintiffs' statistics fail to establish a causal link between the challenged practice and discrimination, courts can infer discrimination only when the 'inexorable zero' or gross statistical disparities in the 'bottom

---

[43]    Dkt. 42, at 13-14.

[44]    The EEOC states that the available positions Crayton, Jones, Lott, Anowey, Haywood, Smith and Price should have gotten were filled by the following 12 non-blacks: Marie Bustamante, Lori Fisher, Crystal Soza, Rachel Todaro, Hector Garza, Jacky Troublefield, Francisco Escamilla, Gilbert Hernandez, Leonidez Mendoza, Francisco Davila, Raquel Hernandez, and Antonio Quintero. Dkt. 42, at 14-15. The EEOC does not discuss the qualifications of these individuals.

line' compel this inference . . .." *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 195 (5th Cir. 1983).[45] The "inexorable zero" charge is not applicable here because O'Reilly in fact hired or promoted black employees into supervisory positions between 2004 and 2008.[46]

The court next will discuss the merits of the individual claims.

**Erika Crayton.** Crayton never applied for a specific promotion but was denied entry into the STEP program in 2004. The EEOC's claim on behalf of Crayton fails for at least two reasons. First, it is time-barred as discussed above. Second, O'Reilly has presented evidence that Crayton was not eligible for STEP in April 2004, the one time she completed the application survey, because she had received a written corrective action in March 2004.[47] The EEOC has not shown that this explanation is pretext for discrimination.

**Dwayne Jones.** There is evidence that Jones completed a STEP survey in April 2004. Again, this claim is time-barred. Moreover, Jones had scored "needs improvement" on his recent performance evaluations.[48] Even Jones does not believe that he was denied STEP admission because of his race.[49]

---

[45]   *Cf. Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 662 (5th Cir. 1983) ("during seven and one-half years, there were hundreds of male manager trainees chosen and not a single woman. The hiring record demonstrates not just disparities in hiring but *total exclusion* of women from the entry level management position." (emphasis in original)).

[46]   Dkt. 31, ex. A-4, A-5.

[47]   Dkt. 31, ex. A (Mendez Aff.), ¶ 31.

[48]   *Id.*, ¶ 32.

[49]   Jones Dep., at 139.

**Douglas Lott.** Lott applied for the STEP program in 2004, 2006, and 2009. Again, the 2004 claim is time-barred. Lott repeatedly testified that he was told that he was not admitted to STEP in 2006 because his supervisors needed to see more leadership qualities from him. He does not feel he has ever been discriminated against by O'Reilly.[50] In 2009, Lott was ineligible for STEP due to a recent corrective action.[51]

**Christian Anowey.** Anowey completed STEP surveys in March 2006 and December 2006. HR claimed on both occasions to have lost his paperwork. He was given an opportunity to apply again, but refused. After the HR person who lost the paperwork retired, he told the new HR supervisor about his two attempts to apply for STEP. She also offered him the opportunity to try again, but he never did. He testified in his deposition that he was no longer interested in becoming a supervisor.[52]

**Torey Haywood.** Haywood completed a STEP survey in March 2004 and January 2008. The 2004 claim is time-barred. He was accepted in 2008, but did not complete the class because he was going to school at the time.[53]

**Christopher Smith.** Smith completed a STEP survey on March 31, 2008. He was accepted, but decided not to participate for personal reasons. He has not applied again

---

[50]   Dkt. 42-25, at 22, 25, 30, 34-35.

[51]   Mendez Aff., ¶ 33.

[52]   Anowey Depo., Dkt. 42-19, at 47.

[53]   Haywood Depo., Dkt. 42-22, at 25-28; Mendez Aff., ¶ 34.

because he is not sure he wants to commit to the program.  He does not believe his failure to complete STEP classes is because of race.[54]

**Crystal Price.**  Price believes she should have been promoted to order processing supervisor in the carton flow department in 2009.[55]  Price was admitted to the STEP program for 2008.  After completing the classes, she took the Management Success Profile test in February 2009 and received a "not acceptable" score.  She was on a leave of absence intermittently from January 15, 2009 until April 15, 2009 and full leave from April 15, 2009 until June 15, 2009.  She reapplied and was readmitted to the 2009 STEP class.  In February 2010 she again received a "not acceptable" score on the Management Success Profile test.[56]

Antonio Quintero was hired as a supervisor-in-training in March 2009 and was given the order processing supervisor job Price wanted in July 2009.  He had prior management experience and a high score on the Management Success Profile test.[57]  The EEOC has not raised a fact issue that the failure to promote Price was discriminatory.

The EEOC has failed to create a jury issue on the promotion claims for the individuals identified above.  First, it has failed in every instance to show that the supervisory positions that came open during the relevant period (roughly 2005 through 2008) were filled with

---

[54]  Smith Depo., Dkt. 31, ex. Y, at 53-55; Mendez Aff., ¶ 36.

[55]  This claim did not arise until after the filing of this lawsuit.

[56]  Mendez Aff., ¶ 37.  There is no allegation that the test itself was discriminatory in purpose or effect.

[57]  *Id.*, ¶ 38.

people less qualified than the employees mentioned above. Second, it has failed to present any evidence that the reasons O'Reilly has given for not giving STEP training or promotions to the employees mentioned above are pretextual. Because the evidence is insufficient to create a jury issue concerning discriminatory intent, O'Reilly is entitled to summary judgment on the EEOC's failure to promote claims.

### H.   O'Reilly's Motion for Partial Summary Judgment on Horton's damages

O'Reilly seeks dismissal of the EEOC's claim for personal injury damages on behalf of Horton. The EEOC stipulates that it will not offer any medical testimony or records in support of compensatory/mental anguish damages for Horton, nor will it argue that her cardiac condition was caused or exacerbated by defendants' actions. EEOC further stipulates that it will not call any treating physicians, including Drs. Weaver and Trillos. Based on the EEOC's stipulations, reiterated in open court at the hearing on November 10, O'Reilly's motion should be granted and any claim for personal injury damages for Horton should be dismissed.

### I.   The EEOC's motion for partial summary judgment

The EEOC moves for summary judgment on O'Reilly's claim for attorney's fees. A district court may award fees to a prevailing defendant in a Title VII case only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." 42 U.S.C. § 2000e-5(k); *Christianburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978).

If the district court adopts this court's memorandum and recommendation, the majority

of the EEOC's claims in this case will be dismissed.  However, the court has recommended denial, for the most part, of O'Reilly's motion based on its affirmative defenses.  The court has found that the EEOC did not act in bad faith in conducting conciliation.  For these reasons, the court cannot say that the claims in this case are "frivolous, unreasonable, or without foundation" and recommends that O'Reilly's request for attorneys' fees be denied.

## Conclusion and Recommendations on Summary Judgment

In sum, the court recommends that O'Reilly's motions for summary judgment (Dkts. 28, 30) be granted in part and denied in part; O'Reilly's motion for partial summary judgment (Dkt. 25) be granted; and the EEOC's motion for partial summary judgment (Dkt. 27) be granted.[58]  Only the EEOC's hostile work environment claim on behalf of Horton should remain for trial.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections.  Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error.  *See* FED. R. CIV. P. 72.

Signed at Houston, Texas on November 23, 2010.

Stephen Wm. Smith
United States Magistrate Judge

---

[58]   The two other pending motions, Defendants' Motion to Exclude Evidence (Dkt. 23) and Defendant's Motion to Exclude Witnesses (Dkt. 24), are best left for *in limine* determination by the district judge before trial.